## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MICHELLE LOPEZ,**

      **Plaintiff,**

v.                                **CASE NO.**  _____

**MICHAEL PADILLA,**
**RAYMOND SCHULTZ,**
**MARTIN CHAVEZ,**
**AND CITY OF ALBUQUERQUE,**

      **Defendants.**

### COMPLAINT FOR EMPLOYMENT DISCRIMINATION, RETALIATION, AND CIVIL RIGHTS VIOLATIONS

Plaintiff, Michelle Lopez, by and through her attorneys Louren Oliveros, Robert J. Gorence and Mark Pustay of Gorence & Oliveros, P.C., hereby submits this complaint for violations of 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Fourteenth Amendment to the United States Constitution, the New Mexico Human Rights Act, and New Mexico state law.

### JURISDICTION AND VENUE

1.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §§ 1981, 1981a, 1983, 1988, 2000e-2 and 2000e-5, with pendent jurisdiction over the state law claims.

2.  Venue is proper in the District of New Mexico under 28 U.S.C. § 1391, as all of the acts complained of occurred, and Plaintiff's cause of action arose, in New Mexico.

## PROCEDURAL HISTORY

3.     On June 11, 2007, Plaintiff filed a complaint with the New Mexico Department of Labor, Human Rights Division (herein referred to "HRD") and the United States Equal Employment Opportunity Commission (herein referred to "EEOC"), alleging employment discrimination on the basis of gender and retaliation in violation of Title VII and the New Mexico Human Rights Act.

4.     On May 14, 2008, the HRD issued a Determination of Probable Cause on Plaintiff's charge.

5.     Plaintiff's claim was administratively dismissed and she was mailed the Notice of Waiver of Hearing on June 6, 2008.

6.     The EEOC issued its Notice of Right to Sue on August 21, 2008.

7.     Plaintiff has exhausted her administrative remedies under the New Mexico Human Rights Act, and all remedies with the EEOC.

## PARTIES

8.     Plaintiff Michelle Lopez is a female resident and citizen of New Mexico.

9.     At all material times, Plaintiff was an employee of the Defendant City of Albuquerque Emergency Communications Center (herein after referred to as "Communications.")

10.    Before November 2006, Defendant Michael Padilla was the manager of the Defendant City's 311 Call Center.   From approximately November 2006 through April 2007, Defendant Padilla was the Director of Communications, a management-level employee of the City, and he exercised supervisory control and authority over Plaintiff.

11.     Defendant Michael Padilla is sued in his individual capacity. At all material times through April 2007, Defendant Padilla was a policy maker employed by the City of Albuquerque and he exercised supervisory control and authority over Plaintiff. At all material times, Defendant Padilla acted under color of law.

12.     Defendant Ray Schultz is sued in his individual capacity. At all material times, Defendant Schultz was a policy maker employed by the City of Albuquerque and he exercised supervisory control and authority over Plaintiff and Defendant Padilla. At all material times, Defendant Schultz acted under color of law.

13.     Defendant Martin Chavez is sued in his individual capacity. At all material times, Defendant Chavez was a policy maker employed by the City of Albuquerque and he exercised supervisory control and authority over Plaintiff, Defendant Padilla, and Defendant Schultz. At all material times, Defendant Chavez acted under color of law.

14.     Defendant City of Albuquerque ("Defendant City") is a governmental entity by whom Plaintiff was employed at all material times. The City is an employer as contemplated by the New Mexico Human Rights Act, NMSA 1978 § 28-1-2 and Title VII of the Civil Rights Act, 42 U.S.C. 2000e-(b), and employs more than 500 persons.

15.     Defendant City is responsible and liable for the acts and omissions of its agents and employees, including, but not limited to, Defendant Padilla, Defendant Schultz, Defendant Chavez, Pete Dinelli, Dr. Bruce Perlman, Deputy Chief Michael Castro, Commander Steve Warfield, Holly Steinberg, and Diana Lueras.

## FACTUAL BACKGROUND

16.   Plaintiff has worked for Defendant City of Albuquerque since 1994, a period of approximately 14 years.

17.   Plaintiff has consistently received positive evaluations for her job performance and has been promoted several times during her career at the City of Albuquerque, including assignments with significant supervisory responsibility.

18.   On October 3, 1998, Plaintiff began working with 911 Communications as an NCIC operator. In approximately March of 2003, Plaintiff was temporarily transferred to the training unit and was assigned the role of training supervisor at Communications. At that time, Plaintiff was a dispatcher.

19.   On February 7, 2004, Plaintiff achieved the position of training supervisor. Defendant City maintained her official title as a floor supervisor although she was never actually a floor supervisor. From the time that she assumed the position of training supervisor in 2003, she remained primarily in the training unit, not on the floor.

20.   In or about November 2006, Defendant City appointed Defendant Padilla to act as a consultant to Communications. After the appointment, he immediately assumed the role of "director" of Communications. Defendant Padilla also held the position of manager of the 311 call center operated by the City of Albuquerque.

21.   Prior to Defendant Padilla's hiring, Defendant City did not conduct a proper background check on him.

22.   Defendant Padilla was not adequately monitored or supervised by Defendant Schultz, Defendant Chavez, or Defendant City. Defendant Padilla was given absolute authority to make

decisions at Communications. Defendant Padilla communicated to City employees his unfettered power to carry out his decisions. This power was bestowed upon Defendant Padilla by Defendants Schultz and Chavez.

23. As training supervisor, Plaintiff answered directly to Pauline Sanchez, who answered directly to Defendant Padilla. Therefore, Plaintiff answered to Defendant Padilla.

24. On several occasions, Defendant Padilla specifically communicated to his subordinates, including Plaintiff, that any failure to precisely follow his directives would result in immediate termination or transfer.

25. While acting as the Director of Communications, Defendant Padilla made numerous sexualized and disparaging comments directed to female subordinates, including Plaintiff.

26. In the Fall of 2005, while he was employed by the City 311, Defendant Padilla asked Plaintiff out on dates on approximately five to eight separate occasions, both via email and personally. She rejected his every request.

27. On or about August 12 or 13, 2006, Plaintiff observed Defendant Padilla driving slowly by her home. Defendant Padilla was uninvited and unwanted at Plaintiff's home. Defendant Padilla later told Plaintiff he was simply looking for land on the market, even though no land on the market was in the area near Plaintiff's home.

28. This incident was reported to Deputy Chief Castro. No action was taken by Defendant City.

29. Despite her explicit requests to the contrary, Defendant Padilla continued to pursue Plaintiff romantically.

30.     Defendant Padilla asked Plaintiff out to dinner in November 2006.  Plaintiff agreed to meet Defendant Padilla in order to inform him that she did not want to date him and that she did not date City employees.

31.     Soon after Plaintiff rejected Defendant Padilla's advances, Defendant Padilla began retaliating against Plaintiff by criticizing her work performance.

32.     Defendant Padilla subjected Plaintiff to intense scrutiny and threatened her with termination or demotion by making her give him a presentation on her training program so that he could evaluate whether her work was adequate and whether she could maintain the position.

33.     Defendant Padilla also openly disparaged and criticized Plaintiff to the management by commenting that Plaintiff was not qualified for her position.

34.     On approximately January 2, 2007, before a staff meeting, Defendant Padilla wrongfully criticized Plaintiff for improperly setting up a room.  He also criticized her because she did not sit at the front of the room with him.

35.     At this same staff meeting, Defendant Padilla threatened to have any individual moved out if they were not "on board" with him.

36.     Defendant Padilla treated other female subordinates at Communications in a degrading fashion.

37.     On January 2 and January 9, 2007, as well as on other occasions, Defendant Padilla repeatedly told female subordinates and other City employees that he had the full authority of Defendant Mayor Chavez, and that if they were not "on board" with him and his ideas, they would be moved out.  He stated several times that Defendant Chavez would approve anything he requested.

38.    Plaintiff heard from others that Defendant Padilla would make comments like, "it may be 2007 out there, but in my house it is the 1950's and women stay home, make tortillas, and have babies."

39.    Defendant Padilla continued making his sexually disparaging comments to Plaintiff and other female subordinates. On January 12, 2007, Defendant Padilla told Plaintiff and Ms. Pauline Sanchez, the Communications Manager, that they should meet him at the Tumbleweed Lounge where they could find themselves "a one-legged man."

40.    Defendants Chavez, Schultz, and the City, created a hostile work environment by allowing Defendant Padilla to continually harass females at Communications.

41.    In or about January 2007, Defendant Padilla saw a photograph on Plaintiff's desk and asked whether it was her boyfriend. When Plaintiff said no, he saw another photograph and asked whether that picture was her boyfriend.

42.    In or about February 2007, Plaintiff and Ms. Pauline Sanchez went to Deputy Chief Michael Castro regarding Defendant Padilla's actions toward Plaintiff. Plaintiff believed that Defendant Padilla was discriminating against her, Ms. Sanchez, Ms. Marilyn Webb and other female supervisors because she rejected Defendant Padilla.

43.    Defendant Padilla still continued to humiliate and harass his female subordinates.

44.    Plaintiff was increasingly uncomfortable around Defendant Padilla to the point that her work was adversely impacted.

45.    At a briefing on March 1, 2007, Defendant Padilla falsely announced that he and Ms. Webb were "running away together" to Las Vegas, Nevada.

46.     During a meeting on approximately March 2, 2007, Defendant Padilla also told Ms. Webb that he was writing a book about "pyscho women." He said that one chapter would be called, "What Executive Women Really Need Is a Great Big Hug."

47.     On approximately March 5, 2007, Defendant Padilla sent an email to Deputy Chief Castro falsely stating that he and Ms. Webb were taking a private vacation together in Las Vegas, Nevada. Defendant Padilla continued telling employees that Ms. Webb and he were taking the vacation together even after Ms. Webb requested that he stop

48.     Defendant Padilla made similarly inappropriate comments to Ms. Sanchez.

49.     When made aware of Padilla's advances to Plaintiff, Deputy Chief Castro told Defendant Padilla not to attempt to have romantic relations with Plaintiff while acting as her superior in Communications.

50.     Defendant Padilla also had inappropriate and discriminatory relationships with two female subordinates while he was the manager of 311.

51.     Upon information and belief, Defendants City, Chavez and Schultz were aware of these relationships, yet took no steps to protect Plaintiff, Marlyn Webb, Pauline Sanchez or other working women at the City.

52.     On March 7, 2007, Plaintiff, along with Ms. Webb and Ms. Sanchez, made a formal complaint with the Defendant City's Equal Opportunity Office (EEO) regarding Defendant Padilla's conduct.

53.     Later that day, Defendant Padilla retaliated against Plaintiff by submitting an inter-office memorandum criticizing the management, which included Plaintiff as a training supervisor.

54.     The Defendant City and Defendant Padilla's supervisors, including, but not limited to, Defendant Chavez and Defendant Schultz, had notice of Defendant Padilla's prior unlawful conduct and took no action to protect other female employees from Defendant Padilla.  In fact, Defendant City's reaction was to retaliate against the Plaintiff and demote Plaintiff.

55.     On April 9, 2007, Pauline Sanchez and Marlyn Webb were transferred out of Communications.

56.     That same day, Plaintiff inquired about her future contact with Defendant Padilla. Plaintiff asked whether Defendant Padilla would have contact with her, and Plaintiff was assured that she would have no direct contact with Defendant Padilla.

57.     Two days later, on April 11, 2007, Dr. Perlman, Deputy Chief Castro and Captain Warfield informed the entire staff that Ms. Sanchez and Ms. Webb were not returning to Communications.  Plaintiff was further advised by Dr. Perlman that employees loyal to Ms. Sanchez and Ms. Webb would need to decide where their loyalties were.  Deputy Chief Castro and Warfield were acting on behalf and at the direction of Defendant City, Defendant Chavez and Defendant Schultz.

58.     On April 19, 2007, while Plaintiff was away from the office on a pre-approved off-day, Pete Dinelli, Ms. Holly Steinberg, and Diana Lueras, approached a dispatcher, Marlene Torres, who had been assisting Plaintiff.  The group demanded that Ms. Torres provide them with Plaintiff's training materials and a "soft" copy of the associated power point presentation used in Plaintiff's training seminar.  Although Plaintiff complied, she was scrutinized and reprimanded for being "resistant" and uncooperative by Captain Warfield.  Plaintiff explained the situation

and noted that Ms. Steinberg and Ms. Lueras were giving her orders from a position of authority, despite the fact they were not in her chain of command.

59.     During this same time period, Defendants Chavez, Schultz, and the City, through Mr. Dinelli and Captain Warfield, restricted Plaintiff's speech and conduct by requiring that she have no contact, personal or professional, with Ms. Sanchez.

60.     Approximately a week later, Pete Dinelli also asked Plaintiff to meet with him, Ms. Steinberg, Ms. Lueras and Captain Warfield. At the meeting, Mr. Dinelli told Plaintiff that people spoke highly of her and that her job was not in jeopardy. He also stated that she and others they would be permanently placed in their current positions. Mr. Dinelli informed Plaintiff that the orders for the positions were on Dr. Perlman's desk and it would likely take a week for the paperwork on the permanent position to be processed.

61.     On May 9, 2007, Plaintiff emailed Captain Warfield, with a carbon copy sent to Mr. Dinelli, requesting the status as to the permanence of her position. Plaintiff relied on Mr. Dinelli's statement at the prior meeting in April that the paperwork would be processed in a week.

62.     On May 14, 2007, Plaintiff received an email response from Mr. Dinelli directly contradicting his statements from the meeting in late April. Mr. Dinelli insisted that he had not told Plaintiff that her job would be made permanent. Instead, Mr. Dinelli said that his statements were "with others present that your job at 911 was not in jeopardy," and that Plaintiff "would not be transferred as was Pauline and Marlyn."

63.     Later in the day on May 14, 2007, Plaintiff was made aware of a former employee's consideration for re-hire. Plaintiff and another supervisor had concerns about this individual's

employment. The other supervisor, Ms. Duran, voiced her concerns with Ms. Steinberg. Ms. Steinberg told Ms. Duran to provide all information regarding their concerns. Ms. Duran asked Plaintiff to request this information from internal affairs be sent directly to Ms. Steinberg and Ms. Lueras.

64.     On May 15, 2007, Captain Warfield told Plaintiff that he intended to discipline Plaintiff for her internal affairs request made the previous day. Plaintiff objected to the discipline as it was unwarranted. No formal disciplinary action was taken against Plaintiff after the initial unwarranted accusations.

65.     At the meeting with Captain Warfield on May 15, 2007, Plaintiff inquired about the status of the paperwork on her position becoming permanent.

66.     In this same time period, Captain Warfield told Plaintiff that he spoke with the chain of command and that her job would be made permanent.

67.     The next day, Ms. Steinberg and Ms. Lueras conducted a series of meetings with employees and supervisors advising that Plaintiff was being relieved from her position as the training supervisor. These meetings occurred without Plaintiff's knowledge and were conducted before she was advised that her duties were to be eliminated.

68.     On May 16, 2007, Plaintiff was informed by Captain Warfield that she would be relieved of her training duties. Captain Warfield told her that Mr. Dinelli commented that she was uncooperative and possessive when it came to her training materials. Captain Warfield informed Plaintiff that she was demoted to a floor supervisor. Plaintiff never received a formal demotion or transfer.

69.    Plaintiff was approached at 2:40 p.m. on May 16, 2007 by Ms. Lueras and Ms. Lori Doyle, Human Resources manager for APD, and was accused of shredding documents related to official, current training materials. No formal disciplinary action was taken against Plaintiff.

70.    Between May 16, 2007 and May 21, 2007, Plaintiff was scheduled to teach a class. Upon entering the class, one of the trainees informed Plaintiff that she believed Plaintiff was not to be going to be supervising them or teaching the class.

71.    Plaintiff was swiftly marginalized after her demotion. On May 21, 2007, she was informed that a memo she had sent to two new employees was officially rescinded and that her training duties were under the authority of another supervisor.

72.    Despite Plaintiff's marginalization and removal from training instruction and supervision, she was still held responsible for the training curriculum, documentation and general paperwork.

73.    On May 22, 2007, Plaintiff was informed by Ms. Steinberg and Ms. Lueras that she was again "in charge" of training.

74.    Despite her lack of supervision or control of the trainees and their instruction, Plaintiff was also told by Captain Warfield that she would be held personally responsible for any "breakdowns" in training.

75.    Wary of her untenable situation – a lack of formal control or supervision of training, but complete responsibility for its breakdown – Plaintiff remained in constant fear of termination.

76.    From this point forward, Plaintiff was ostracized and was routinely left out of essential meetings, email correspondence, and other communication.

77.     Plaintiff was continuously monitored and scrutinized by Ms. Steinberg and Ms. Lueras at the direction of Defendant Pete Dinelli, Defendant Schultz, Defendant Chavez, and Defendant City.

78.     On June 28, 2007, Plaintiff became aware that Captain Warfield that changes were being made in the training unit without her knowledge, despite the fact that she was again acting as the training supervisor.

79.     On July 25, 2007, Captain Warfield circulated an interoffice memorandum that Ms. Webb and Ms. Sanchez had been relieved of all managerial duties and responsibilities.

80.     On October 2, 2007, Plaintiff was made aware that she had not been included on the 911 supervisor mailing list, despite the fact she was a supervisor at Communications.

81.     On October 9, 2007, Plaintiff became aware that she was being investigated about her conduct with a specific trainee.  Plaintiff understood that an investigation had been launched where several individuals, primarily trainees who were her subordinates, were being asked to evaluate her job performance and job duties.

82.     Concerned about the substance of the investigation and the nature with which it was being conducted, Plaintiff wrote an email to Warfield inquiring about the investigation. She requested that she be interviewed, and also requested a formal statement of the basis for the investigation.

83.     Captain Warfield told Plaintiff that he was not conducting an "official investigation," but rather a "preliminary investigation" at Mr. Dinelli's direction.  The investigation was eventually terminated.  No formal charges were filed against Plaintiff.

84.    On October 18, 2007, Plaintiff received an email from Ms. Steinberg requesting that Plaintiff include Ms. Steinberg or Ms. Lueras in every training seminar from that point forward.

85.    On February 15, 2008, Deputy Chief Castro, who had participated in the EEO investigation regarding Padilla was officially taken out of the chain of command.

86.    Plaintiff continued to be scrutinized by the Defendants through March, 2008.

87.    Since reporting Defendant Padilla's sexual harassment to the City of Albuquerque EEO and later to the HRD, Plaintiff has been demoted. She has lost her management and supervisory status, has been denied access to critical information, has been denied the ability to supervise employees or train new employees effectively, has been progressively marginalized at Communications, has been subject to arbitrary discipline and threat of disciplinary action, and has had an ongoing, persistent fear that she will lose her job and associated retirement benefits.

88.    Plaintiff has never been formally reprimanded for any incident related to Communications during her tenure at Communications.

89.    Plaintiff has not enjoyed a promotion since submitting her complaint to the City's EEO.

90.    Plaintiff has never received a negative evaluation during her tenure at Communications.

91.    The conduct of Defendant Padilla, Defendant Chavez, Defendant Schultz, and Defendant City, through their agents and employees, has caused Plaintiff damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, psychological harm, anxiety and distress.

92.    Male employees in similar circumstances at the City were treated differently by Defendants than was Plaintiff.

## COUNT I: NOTICE OF APPEAL UNDER THE NEW MEXICO HUMAN RIGHTS ACT

93.    Plaintiff incorporates each allegation above as though fully set forth herein.

94.    Defendant City engaged in a series of unlawful discriminatory and retaliatory practices as described above in violation of NMSA 1978 § 28-1-7.

95.    Defendant's violations of the New Mexico Human Rights Act caused Plaintiff damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, psychological harm, anxiety and distress.

96.    Plaintiff has satisfied all administrative prerequisites to bringing suit under the NMHRA.

97.    Defendant City is liable under *respondeat superior* for the acts of its employees, agents, servants and/or representatives, including but not limited to, Defendant Padilla, Defendant Schultz, Defendant Chavez, Pete Dinelli, Bruce Perlman, Diana Lueras, Holly Steinberg, and Steve Warfield.

98.    Plaintiff hereby requests a trial *de novo* on her NMHRA claims.

99.    The conduct of Defendant City was intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's rights so as to warrant punitive damages.


## COUNT II:  42 U.S.C. §1983 DENIAL OF EQUAL PROTECTION AGAINST DEFENDANT PADILLA

100.    Plaintiff incorporates each allegation above as though fully set forth herein.

101.    Defendant Padilla singled out Plaintiff and purposefully treated her in a spiteful and malicious manner because she was a woman and so that she would be unlawfully and

unjustifiably demoted and humiliated in her place of employment. Further, Defendant Padilla intentionally targeted Plaintiff when other similarly situated male employees were not treated in the same manner.

102.    Defendant Padilla's actions violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

103.    The actions of City officials with policy making authority, including Defendants Padilla, Schultz, and Chavez, towards female supervisors at Communications, including Plaintiff, Ms. Webb and Ms. Sanchez, was so widespread and pervasive as to establish a policy or custom among city officials of denying equal protection female supervisors at Communications.

104.    Defendant City affirmatively knew about and tolerated, or acquiesced in, Defendants Padilla, Schultz, and Chavez's conduct and failed to exercise reasonable care in responding effectively and/or proportionately.

105.    Defendant Padilla's wrongful actions caused Plaintiff damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, psychological harm, anxiety and distress.

106.    The conduct of the Defendant Padilla was objectively unreasonable, as well as intentional, willful, wanton, obdurate, malicious, recklessly indifferent and in gross and reckless disregard of Plaintiff's rights so as to warrant punitive damages.

## COUNT III: 42 U.S.C. §1983 SUPERVISORY LIABILITY AGAINST DEFENDANTS CHAVEZ AND SCHUTLZ

107.    Plaintiff incorporates each allegation above as though fully set forth herein.

108.   Defendant Padilla intentionally and deliberately discriminated against Plaintiff because of her gender in the workplace, contrary to Title VII, and he violated their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment.

109.   Defendants Schultz and Chavez were, at all material times, policy makers at the City. Therefore, Defendant City is responsible for their acts.

110.   Defendants Schultz and Chavez had, at all material times, supervisory authority over Defendant Padilla.

111.   Defendants Schultz and Chavez had actual or constructive knowledge of the potential for Defendant Padilla to discriminate against women under his supervision, such as Plaintiff.

112.   Because Defendants Schultz and Chavez clothed Defendant Padilla with absolute authority during his tenure at Communications and did not properly supervise or monitor him, the Defendants acquiesced in and authorized his conduct by failing to stop it.

113.   The actions of Defendants Schultz and Chavez were the moving force behind, and directly caused, Plaintiff's constitutional injuries as set forth above.

114.   Defendants' wrongful actions caused Plaintiff damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, psychological harm, anxiety and distress.

115.   The conduct of Defendants Schultz and Chavez was objectively unreasonable, as well as intentional, willful, wanton, obdurate, malicious, recklessly indifferent and in gross and reckless disregard of Plaintiff's rights so as to warrant punitive damages.

## COUNT IV: CLAIM FOR PROCEDURAL DUE PROCESS VIOLATION UNDER 42 U.S.C. §1983 AGAINST DEFENDANTS SCHULTZ AND CHAVEZ

116.  Plaintiff incorporates each allegation above as though fully set forth herein.

117.  According to the terms of her employment, Plaintiff could only be demoted according to City policy.  As such, Plaintiff had a constitutionally protected property interest in her continued employment as training supervisor.

118.  Plaintiff was demoted and Defendants Schultz and Chavez never provided Plaintiff with a hearing of any kind either before, or after, her demotion.

119.  Defendants Schultz and Chavez's decision to demote Plaintiff from her position, without providing her with notice of the reasons for her demotion, an explanation of the City's evidence against her, or an opportunity to present her side of the story was against City policy and were constitutionally inadequate.

120.  These Defendants' actions as set forth above violated Plaintiff's right to Procedural Due Process pursuant to the Fourteenth Amendment to the United States Constitution.

121.  These Defendants' acts and omissions caused the Plaintiff damages and injuries including, but not limited to, lost pay and benefits, lost earning capacity, lost opportunities for promotion, lost job responsibilities and prestige, damage to reputation, emotional and psychological distress.

122.  The conduct of Defendants Schultz and Chavez was objectively unreasonable, as well as intentional, willful, wanton, obdurate, malicious, recklessly indifferent and in gross and reckless disregard of Plaintiff's rights so as to warrant punitive damages.

## COUNT V: TITLE VII DISCRIMINATION CLAIM - DISPARATE TREATMENT AGAINST DEFENDANT CITY OF ALBUQUERQUE

123.   Plaintiff incorporates each allegation above as though fully set forth herein.

124.   Plaintiff's status as a female places her in a protected class under Title VII.

125.   Defendant City subjected Plaintiff to adverse employment actions because of her sex in violation of Title VII.  The adverse employment actions include, but are not limited to, subjecting Plaintiff to sexual harassment and discrimination, demoting Plaintiff, stripping Plaintiff of her primary training responsibilities, isolating and ostracizing Plaintiff, unreasonably monitoring Plaintiff and Plaintiff's performance, and stripping Plaintiff of meaningful job duties and responsibilities, loss of income and loss of promotion opportunities and pay raises.

126.   Defendant City had no legitimate, non-discriminatory, non-pretextual reason for subjecting Plaintiff to these adverse employment actions.

127.   Defendant City treated Plaintiff less favorably than similarly situated, male employees.

128.   Defendant's wrongful actions caused Plaintiff damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity and loss of income, loss of promotion opportunities, psychological harm, anxiety and distress.

129.   Defendant City's conduct was intentional, willful, wanton, obdurate and in gross and reckless disregard of Plaintiff's rights so as to warrant punitive damages.

130.   Plaintiff has satisfied all administrative prerequisites to bringing suit under Title VII.

## COUNT VI: TITLE VII DISCRIMINATION CLAIM - HOSTILE WORK ENVIRONMENT AGAINST DEFENDANT CITY OF ALBUQUERQUE

131.   Plaintiff incorporates each allegation above as though fully set forth herein.

132.   As set forth above, Plaintiff was subjected to harassment and adverse job conditions by Defendant City because of her gender.  The harassment and adverse job conditions were frequent, severe, humiliating, and unreasonably interfered with Plaintiff's performance.  These actions constitute a continuing course of conduct.

133.   Defendant City knew that Defendant Padilla had previously engaged in sexual harassment, but Defendant City refused to take effective corrective action.  Defendant City is therefore liable for the harassment Plaintiff experienced.

134.   Further, Defendant City cloaked Defendant Padilla with the absolute authority to terminate any employee at Communications at his whim, stifling Plaintiff's ability, as well as others' ability, to report his inappropriate conduct, thereby allowing his conduct to go unabated and unchecked.

135.   The aforementioned conduct was sufficiently severe or pervasive as to alter the terms of Plaintiff's conditions of employment and created a hostile work environment.

136.   Defendant City's actions caused Plaintiff damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity, loss of income, loss of promotion opportunities, psychological harm, anxiety and distress.

137.   The conduct of Defendant City was intentional, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's rights so as to warrant punitive damages.

138.   Plaintiff has satisfied all administrative prerequisites to bringing suit under Title VII.

## COUNT VII: TITLE VII CLAIM -
## RETALIATION AGAINST DEFENDANT CITY OF ALBUQUERQUE

139. Plaintiff incorporates each allegation above as though fully set forth herein.

140. Plaintiff engaged in conduct protected by Title VII in reporting sex discrimination to her supervisors, to the New Mexico Human Rights Division and to the City's EEO.

141. Defendant City retaliated against Plaintiff for engaging in her protected conduct by subjecting Plaintiff to adverse employment actions. These adverse employment actions include, but are not limited to, subjecting Plaintiff to sexual harassment and discrimination, demoting Plaintiff, stripping Plaintiff of her primary training responsibilities, isolating and ostracizing Plaintiff, unreasonably monitoring Plaintiff and Plaintiff's performance, and stripping Plaintiff of meaningful job duties and responsibilities, loss of income and loss of promotion opportunities and pay raises.

142. Plaintiff's protected conduct was a "but-for" cause of Defendant City's wrongful actions.

143. Defendant City had no legitimate, non-retaliatory, non-pretextual reasons for subjecting Plaintiff to the adverse employment actions stated above.

144. Defendant City's actions caused Plaintiff damages, including, but not limited to, demotion and ostracization, loss of prestige and reputation, lost earning capacity, loss of income, loss of promotion opportunities, psychological harm, anxiety, and distress.

145. Defendant City's conduct was intentional, willful, wanton, obdurate and in gross and reckless disregard of Plaintiff's rights so as to warrant punitive damages.

146. Plaintiff has satisfied all administrative prerequisites to bringing suit under Title VII.

## COUNT VIII:
## CLAIM FOR MUNICIPAL LIABILITY AGAINST DEFENDANT CITY

147. Plaintiff incorporates each allegation above as though fully set forth herein.

148. Defendants Padilla, Schultz and Chavez were, at all relevant times, policy-makers for Defendant City.

149. The actions of Defendants Padilla, Schultz, and Chavez have caused Plaintiff constitutional injuries as set forth above.

150. The Defendant City maintained a custom, policy, or practice of encouraging or condoning the discrimination of women, and of retaliating against management and supervisory level employees who report sexual harassment, and this custom, policy, or practice proximately caused Plaintiff's damages and injuries as set forth herein.

151. The Defendant City had actual notice that their conduct as set forth above with regard to the Defendants was substantially certain to result in constitutional violations and the City chose to disregard the risk of harm.

152. The Defendant City's acts and omissions caused the Plaintiff damages and injuries including, but not limited to, lost pay and benefits, lost earning capacity, lost opportunities for promotion, lost job responsibilities and prestige, damage to reputation, and emotional and psychological distress.

### JURY TRIAL DEMAND

153. Plaintiff hereby demands a trial by jury on all issues so triable.

### PRAYER

WHEREFORE, Plaintiff prays for judgment as follows:

1.    Compensatory damages against the Defendants in an amount to be determined by the

finder of fact;

2.    Punitive damages as allowed by law against Defendants in an amount to be determined by

the fact finder;

3.    Reasonable costs and attorneys' fees incurred in bringing this action as permitted by law;

4.    Pre- and post-judgment interest; and

5.    Any other relief this Court deems just and appropriate.

                                     Respectfully submitted,

                                     E-FILED

                                  _____

                                  Louren Oliveros
                                  Robert J. Gorence
                                  Mark Pustay
                                  Gorence & Oliveros, P.C.
                                  Attorneys for Plaintiff Michelle Lopez
                                  201 12th St. NW
                                  Albuquerque, NM 87102
                                  505-244-0214 (phone)
                                  505-244-0888 (fax)